## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

-----------------------------------------------------------------x
: 
ADAM CULBERT and                      :
EXPLODINGDOG LLC,                :
: 
Plaintiffs,                          :
           v.                :     Civ Case No. ____15-1563_____
: 
THEODORE S. LIGETY,          :
ANOMALY ACTION SPORTS, INC., and   :     **JURY TRIAL DEMANDED**
ANOMALY ACTION SPORTS, SRL,   :
: 
Defendants.                   :
----------------------------------------------------------- x

## COMPLAINT FOR COPYRIGHT INFRINGEMENT, TRADEMARK INFRINGEMENT, UNFAIR COMPETITION, DECEPTIVE TRADE AND SALES PRACTICES AND UNJUST ENRICHMENT

Plaintiffs Adam Culbert and Explodingdog LLC, by and through their undersigned counsel, hereby set forth this Complaint against Theodore S. Ligety, Anomaly Action Sports, Inc. and Anomaly Action Sports, Srl.

### NATURE OF THE ACTION

1.     This is an action for an injunction, damages and other appropriate relief arising out of Defendants' direct and indirect violations of Section 106 of the Copyright Act, 17 U.S.C. § 101, *et seq.* (hereinafter the "Copyright Act"), Section 43(a) of the Lanham Act, 15 U.S.C. § 1125, as well as Defendants' trademark infringement, unfair competition, deceptive trade practices, and deceptive sales practices under the state and common law of the State of Connecticut in connection with Mr. Culbert's Explodingdog Red Robot character.

2.     At the 2014 Winter Olympics in Sochi, United States Olympic alpine skier

Theodore ("Ted") S. Ligety ("Ligety") wore a helmet that featured a reproduction or derivative

of Adam Culbert's copyrighted Red Robot character and his "Red Robot" trademark without

ever contacting Adam Culbert ("Mr. Culbert") for permission or license to use his Red Robot.

3.     According to the business model of the skiing equipment company that Ligety

founded, Ligety would wear products in competition -- including the unauthorized helmet he

wore at the Olympics with the Red Robot design, that his skiing equipment company would soon

sell worldwide due to the massive exposure of Ligety's success before an Olympic-sized

audience.  At no time did Ligety or the skiing equipment company ever obtain permission or

license to use Mr. Culbert's Red Robot design or trademark.

4.     Despite the protests of Mr. Culbert, Ligety continued to wear the unauthorized

helmet in competitions into the 2014/2015 FIS World Cup ski season and to this day Anomaly

Action Sports, Inc. and Anomaly Action Sports, Srl continue to offer the unauthorized Red

Robot helmet and other unauthorized Red Robot products for sale, all to the damage and harm of

Adam Culbert and his Explodingdog LLC business.

## JURISDICTION AND VENUE

5.     This Court has subject-matter jurisdiction over this action pursuant to 17 U.S.C.

§§ 101, *et seq.*, 15 U.S.C. § 1121, and 28 U.S.C. §§ 1331, 1338, and 1367(a) and the U.S.

Constitution because this Complaint raises federal questions under the Copyright Act, the

Lanham Act, and it involves state causes of action, including claims of copyright infringement,

statutory and common law trademark infringement, unfair competition, unfair trade practices, and false advertising.

6.     Venue is proper in this Court under 28 U.S.C. §§ 1391 and 1400(a) because, *inter alia,* Defendants have engaged in a significant amount of business activity in this District and a substantial amount of infringing activity occurred in this District.

7.     Defendants are subject to the personal jurisdiction of this Court because, *inter alia*, Defendants have engaged in a significant amount of business activity in this District and a substantial amount of infringing activity occurred in this District, including, on information and belief, Defendants actively promote their products in Connecticut and have authorized dealers in Connecticut to sell the infringing products, and have sold infringing product in Connecticut.

## PARTIES

8.     Plaintiff Adam Culbert is an individual residing at 7 Cobbs Road, West Hartford, CT, 06107.

9.     Plaintiff Explodingdog, LLC is a Connecticut limited liability corporation with its principal place of business at 7 Cobbs Road, West Hartford, CT, 06107.

10.     Upon information and belief, Defendant Theodore S. Ligety ("Ligety") is an individual residing in Park City, Utah.

11.     Upon information and belief, Defendant Anomaly Action Sports, Inc. ("Anomaly USA"), is a New Hampshire corporation with its principal place of business at 7 Central Square, New Boston, NH 03070.

12.     Upon information and belief, Defendant Anomaly Action Sports, Srl. ("Anomaly Srl"), is an Italian company with its principal place of business at Viale Ancona, 26 30172

Venezia-Mestre, Italy. Anomaly USA and Anomaly Srl are sometimes collectively referred to as "Anomaly" and hereinafter all three Defendants are sometimes referred to as "Defendants").

## BACKGROUND

### Adam Culbert and Explodingdog.com

13.     Adam Culbert ("Mr. Culbert") is an illustrator and author under the pseudonym Sam Brown most noted for his "explodingdog" website, <explodingdog.com>. Explodingdog LLC is an entity Mr. Culbert formed to oversee his business related to his artwork.

14.     The explodingdog.com website is a crowd-sourced comic blog that works under the concept that visitors of the explodingdog.com website send Mr. Culbert short phrases for inspiration and he picks certain ones to illustrate. The drawings are titled with the inspiration phrase and drawn and rendered digitally. Mr. Culbert's illustrations are known for their distinctive style and their poignant and sometimes unexpected take on the phrases on which they are based.

15.     Mr. Culbert's artwork has been presented on his explodingdog.com website since 2000 at <www.explodingdog.com> and on his Tumblr page since 2008 at <www.explodingdog.tumblr.com>. Both websites have archives of Mr. Culbert's past artwork.

16.     Mr. Culbert has used many recurring visual motifs and characters and recurring themes in his explodingdog work. The visual motifs, in addition to the "Red Robot" character that is the subject of the present case, include stick figures, fish, birds, stars, clouds, monsters, and menacing cityscapes. Some of the reoccurring themes are loss, love, joy, loneliness, menace, confusion, and freedom.

17.     Mr. Culbert and his work have been featured in many newspapers and publications, including in the *New York Times*, *USA Today*, *Wired* magazine, the *Austin*

4

*Chronicle*, on the *Bostonist* website, *The Morning News* website, and *BPM* magazine. Examples of these articles can be found at **Exhibit A.**

18. Mr. Culbert has also written a number of books of art and short stories under his pseudonym which are based in part on the art of his website:

- *Wish For Something Better* (2001, Explodingdog LLC, ASIN B002WZRKNQ);
- *New Job* (2002, Explodingdog LLC, ISBN 0971710503);
- *Amazing Rain* (2004, Soft Skull Press, ISBN1932360506);
- *Thinking of You* (2004, Explodingdog LLC, ISBN 0971710511);
- *Thinking of You 2* (2006, Explodingdog LLC, ISBN 9780971710528);
- *Explodingdog 2001* (2007, Explodingdog LLC, ISBN 9780971710535); and
- *Sometimes I Forget You're A Robot* (2013, Dial Books, ISBN 0803738250)

19. Over the fifteen years since Mr. Culbert has launched the explodingdog.com website in 2000, his work has grown a large and loyal following.

20. Mr. Culbert supports himself and his family through his art, creativity, and illustrations from his explodingdog body of work.

21. Mr. Culbert has sold merchandise related to his art since 2000. In addition to original artwork and individual prints of his explodingdog artwork, Mr. Culbert sold his books and apparel, including t-shirts and hoodies. The explodingdog ecommerce used to be found on the explodingdog.com website. Since 2008, Mr. Culbert has moved his ecommerce store website to his "Building a World" website at <www.buildingaworld.com>.

22. Mr. Culbert has licensed two entities, TopatoCo and Nuvango, as well as their predecessors, to produce and sell explodingdog merchandise based upon his artwork, and receives royalties for those sales. This merchandise includes apparel, greeting cards, prints, and skins for laptops and phones featuring reproductions of his explodingdog illustrations. Mr. Culbert had also previously licensed Urban Outfitters to use an explodingdog illustration. Aside

from his book publishers, Soft Skill Press and Dial Books (a Division of Penguin Books), Mr. Culbert has not granted permission to use his intellectual property to others and has diligently policed the market for unauthorized reproductions and derivatives.

23. Mr. Culbert obtained copyright registrations in his explodingdog.com artwork for his complete works from each of the years 2000, 2001, 2002, and 2003. Printouts of the Copyright Office records for these registrations are attached hereto as **Exhibit B.**

24. Mr. Culbert's 2-Dimensional artwork titled "explodingdog 2000" from his body of work from explodingdog.com from the year 2000 is protected by U.S. Copyright Registration No. VA 1-633-758 with a registration date of January 29, 2008. The registered artwork can be found at <http://explodingdog.com/2000.html> and thumbnails of the registered artwork of "explodingdog 2000" are provided at **Exhibit C**.

25. Mr. Culbert's 2-Dimensional artwork titled "explodingdog 2001" from his body of work from explodingdog.com from the year 2001 is protected by U.S. Copyright Registration No. VAu 965-393 with a registration date of January 29, 2008. The register artwork can be found at <http://explodingdog.com/2001.html> and thumbnails of the registered artwork of "explodingdog 2001" are provided at **Exhibit D**.

26. Mr. Culbert's 2-Dimensional artwork titled "explodingdog 2002" from his body of work from explodingdog.com from the year 2002 is protected by U.S. Copyright Registration No. VA 1-635-885 with a registration date of February 4, 2008. The registered artwork can be found at <http://explodingdog.com/2002.html> and thumbnails of the registered artwork of "explodingdog 2002" are provided at **Exhibit E**.

27.     Mr. Culbert's 2-Dimensional artwork titled "explodingdog 2003" from his body of work from explodingdog.com from the year 2003 is protected by U.S. Copyright Registration No. VA 1-642-892 with a registration date of February 4, 2008. The register artwork can be found at <http://explodingdog.com/2003.html> and thumbnails of the registered artwork of "explodingdog 2003" are provided at **Exhibit F**.

The Red Robot

28.     Mr. Culbert first introduced the Red Robot to explodingdog as an on-going character and motif in January 2000.  The copyrighted illustration shown below, entitled "thats disgusting" was first published on explodingdog.com in July 2000 and is an example of an early illustration of the Red Robot.



29.     Mr. Culbert's work struck an instant chord with his audience, and as a pioneer in online crowd-source comics, the popularity of the explodingdog.com website was immediate.

7

The Red Robot was a large part of that appeal, and the Red Robot character created a strong association between the Red Robot and the exploding dog website.

30.     The Red Robot has appeared continuously in Mr. Culbert's work over the past 15 years.  The copyrighted illustration shown below, entitled "and you'll find me, crying, crunched compactly into a ball in the corner of the room all sad and depressed-like" was part of "explodingdog 2001".



31.     The copyrighted illustration shown below, entitled "my friends are going to save the world" was part of "explodingdog 2002".



32.     The copyrighted illustration shown below, entitled "painting a rainbow" was part of "explodingdog 2003".



33.     There are dozens of illustrations including the Red Robot character in the registered copyrighted collections of "explodingdog 2000", "explodingdog 2001", "explodingdog 2002", and "explodingdog 2003", as seen in **Exhibits C-F**.

34.     And over the course of illustrating explodingdog, Mr. Culbert has drawn hundreds of examples of the Red Robot.  Each Red Robot is hand-drawn by Mr. Culbert, and the resultant uniqueness in the character and in each line stroke is evident in his work.  Some more examples of the Red Robot are shown in the collage below:



35.     The Red Robot was first incorporated into merchandise in October of 2000 when t- shirts with the character were offered for sale online.  Since then, Mr. Culbert's artwork including the Red Robot has been featured on all types of explodingdog merchandise sold by Mr. Culbert and his licensees.

36.     This link to the internet archive at archive.org is of the explodingdog.com store in 2001 selling Red Robot shirts:

<https://web.archive.org/web/20010604065808/http://www.explodingdog.com/shirtorder/index.html>.  This link to the internet archive at archive.org is of the explodingdog.com store in 2004 selling Red Robot shirts and hoodies:

<https://web.archive.org/web/20040815022336/http://explodingdog.com/shirtorder/index.html>.  Copies of these archived pages are found at **Exhibit G** .

37.     At **Exhibit H** is an example of explodingdog merchandise where the "robot city" illustration featuring the Red Robot is reproduced on a t-shirt and sold by licensee TopatoCo. Below and at **Exhibit I** are examples of explodingdog merchandise where the "i like birds" illustration featuring the Red Robot is reproduced on apparel, phone and electronics cases and skins, and throw pillows that are sold by licensee Nuvango.



38.     As one of the most prominent characters of explodingdog, the Red Robot appeared in each of Mr. Culbert's books published after 2001.

39.     *Sometimes I Forget You're A Robot* is Mr. Culbert's most recent book and the Red Robot is the featured character.  It was published on October 17, 2013 by the Penguin Youth Readers Group, Dial Books.  It is a children's book about a little boy who has always dreamed of having his own robot, and in his imagination, the little boy's toy robot is the Red Robot.  Below are images of the front and back covers of *Sometimes I Forget You're A Robot* illustrating the Red Robot with the boy in the book.



40.     The artwork and text of *Sometimes I Forget You're A Robot* are protected by U.S. Copyright Registration No. TX 7-852-372 with a registration date of February 7, 2014. A printout of the Copyright Office records for TX 7-852-372 is attached at **Exhibit J**.

**The RED ROBOT Trademark**

41. The popularity of the character created a strong association between Red Robot and Mr. Culbert's Explodingdog website and artwork. This association was enhanced by Mr. Culbert's decision to use the Red Robot as the logo and trademark for his online store front at the Building a World website.

42. Since launching the Building a World website in 2008, a Red Robot has been used in conjunction with the website and the ecommerce conducted from the website to sell explodingdog merchandise. At first, the logo was a standing Red Robot, as seen on the spine of the *Sometimes I Forget You're A Robot* hardcover book.

43. Continuously and exclusively since June 2012, Mr. Culbert has used a sitting Red Robot logo (the "RED ROBOT trademark") in connection with his online retail store services at the Building a World website.

44. The RED ROBOT trademark is shown below:



45. The RED ROBOT trademark is also shown below, as it is consistently used to identify the Building A World website, which is the Explodingdog ecommerce store, at the top of the website and adjacent to the BUILDING A WORLD trademark.



46.     The RED ROBOT trademark has also been continuously and exclusively used since June 2012 on all Building a World invoices, packing slips and letterhead in the same manner.

47.     Fans and admirers of Mr. Culbert and of his explodingdog website and consumers of his artwork and explodingdog merchandise have come to associate the RED ROBOT trademark with Mr. Culbert's artwork and the sale of apparel and merchandise featuring reproductions of his artwork.

48.     As a result of this use over many years to identify Mr. Culbert's retail services for artwork and the sale of apparel and merchandise featuring reproductions of artwork, the RED ROBOT trademark has attained a high level of strength and distinctiveness in the minds of general public and consumers and serves as a means by which those goods and services are distinguished from those of other companies in the market.

**Background on Defendants**

49.     Ted Ligety is an American alpine ski racer and a two-time Olympic gold medalist as well as a winner of five World Cup Giant Slalom titles and four World Championship gold medals.

50.     As a result of his success as a skier, Ligety has received valuable endorsements from some of the world's most famous companies and brands.  On information and belief, Ligety has been endorsed by Putnam Investments, Audi, Head, and GoPro, amongst others.  On information and belief Ligety has appeared in television commercials for Procter & Gamble's Vicks NyQuil and DayQuil, Walgreens, Citibank, and Kellogg's in advance of the 2014 Winter Olympics in Sochi.

51.     On information and belief, following his Olympic gold medal at Turin in 2006, Ligety started Shred Optics, a ski equipment company.  Shred Optics products are sold under the "Shred" trademark.

52.     On information and belief, Shred Optics produces ski goggles, sunglasses, and helmets and Ligety designs all the products and uses them himself in competition.

53.     On information and belief, Ligety is also a co-founder, along with Carlo Salmini, of the brands Shred Optics and Slytech Protection, brands now owned and distributed by Anomaly.

54.     On information and belief, Defendant Ligety is the President of Defendant Anomaly USA as well as a member of the Board of Directors of Anomaly USA.  Attached as **Exhibit K** is the Anomaly Action Sports Inc.'s 2015 Annual Report filed with the States of New Hampshire.

55.     Upon information and belief, Anomaly USA is a subsidiary of Anomaly Srl. **Exhibit L** is a press release titled *Anomaly Action Sports Srl Assumes Ownership and Operations of Shred and Slytech Brands from Cersal Srl starting January 1st, 2011.*

56.    Upon information and belief, Anomaly maintains a website to advertise, sell, and offer for sale its Shred products at <www.shredoptics.com>.

57.    Upon information and belief, additionally, Anomaly also utilizes a distribution channel of "dealers" throughout the country and the world, made up of authorized ski equipment shops, including in Connecticut to sell its products into Connecticut and worldwide.

**Defendants' Marketing Strategy**

58.    Upon information and belief, on or around June 2013, Ligety credited his success in the skiing World Cup, where he wore and marketed Shred products, as a reason for his company's progress and success.  At **Exhibit M** is a copy of June 12, 2013 article on the website Malakye.com titled "Anomaly Action sports Q&A with co-founders Carlo Salmini and Ted Ligety".

59.    Upon information and belief, Ligety leverages his skiing success to grow not just his personal brand, but his company's brand as well.  Speaking of Shred to the *NY Times,* Ligety explained that "I did it to make money to. . . .[Shred] has let me leverage who I am as an athlete into a product."  At **Exhibit N** is a copy of a February 12, 2014 article in the *NY Times* titled "Told to Be 'Realistic,' Ted Ligety Defied His Doubters".

60.    Upon information and belief, it is part of Anomaly's business model to have Ligety prominently wear Shred products in competition to increase sales of those products due to the massive exposure of Ligety's skiing before a world-wide audience.  And Ligety is not circumspect about his dual role and interests as an athlete and a business man.  Ligety explained to *Inc*, "My priority is skiing fast, but I think that's in line with what's good for our business.  The

better I do, the more exposure we get."  At **Exhibit O** is a printout of an article from the February 2014 issue of *Inc.* magazine titled "Olympic Skier Ted Ligety's Other Job: Entrepreneur".

61.     Upon information and belief, Ligety and Anomaly hoped to enhance this business model by having Ligety's exposure and success while wearing Shred products  at the 2014 Winter Olympics in front of an Olympic-sized audience result in even greater exposure and further increased sales of those Shred products.  Ligety's Olympic appearance was intended to be a major marketing opportunity for Anomaly and Anomaly was banking on a big boost from the Sochi Olympics, which took place from February 7-23, 2014.

62.     Upon information and belief, on or around January 2014, Federico Merle, Anomaly'*s* Chief Financial Officer and Chief Marketing Officer stated that "There's going to be 200 million people from all over the world looking at our athletes . . . It would cost a lot of money to buy that kind of advertising."  At **Exhibit P** is a copy of an article titled "*A Sports Accessory Startup Hopes to Seize the Sochi Moment*" dated January 30, 2014 in Business Week. According to Anomaly, there is no better promotion for a ski equipment company than to win gold in the Olympics.

63.     Upon information and belief, Ligety and Anomaly's marketing strategy paid off, with the Shred products worn by Ligety benefitting from an Olympic sized audience with Anomaly's "Shred" trademarks featured prominently on Ligety's goggles and helmets.  The gear that Ligety chooses to wear in competition is not just a personal choice, but also a business decision.

64. Upon information and belief, the buzz surrounding Ligety's skiing to win gold medals at the Sochi Olympics, along with the branding on his helmets and goggles, was so immense, it appeared to have crashed the Anomaly website where Shred products were sold.

65. Upon information and belief, on the night that Ligety's gold-medal winning performance was televised on NBC, according to a report by *Business Insider*, the shredoptics.com website showed an "Internal Server Error" during the broadcast, suggesting the server was overloaded. At **Exhibit Q** is an article titled "Ted Ligety's Gold Medal Performance Appears To Have Crashed His Company's Website" dated February 19, 2014 from the *Business Insider*.

66. Upon information and belief, Ligety and Anomaly understand and respect the importance and power of controlling how the Shred brand and intellectual property are used and exposed to the public. Unfortunately, that respect did not extend to allowing Mr. Culbert to control his own brand and intellectual property.

**Defendants' Infringing Conduct**

67. At the Sochi Olympics, Ligety wore a helmet that featured a reproduction or derivative of Mr. Culbert's Red Robot without Plaintiffs' knowledge or permission.



68.     No request had ever been made to Mr. Culbert or to Explodingdog LLC for the

right to use, reproduce, sell or offer for sale products with Mr. Culbert's Red Robot character or

the RED ROBOT trademark.

69.     The reaction on Mr. Culbert's explodingdog websites and social media was

immediate to seeing Ligety wear a helmet with the Red Robot on it at the Olympics.  Attached is

a Tumblr message to Mr. Culbert asking "Am I nuts or did I see Red Robot riding on Olympic

skier Ted Ligety's helmet tonight" at **Exhibit R**.

70.     This was the first instance that Mr. Culbert became aware of the unauthorized use

of his Red Robot.

71.     Mr. Culbert investigated what he had heard and found pictures of the helmet that

Ligety was wearing.  Below is a picture of Ligety wearing the helmet with reproductions or

derivatives of his Red Robot.



72.     Mr. Culbert later became aware that this robot helmet design is known by

Anomaly as the "Robot Boogie" design.  The design from Ligety's unauthorized helmet with red

and blue robots will be referred to as the unauthorized "Robot Boogie" design herein as well for convenience.

73.     As shown, the unauthorized "Robot Boogie" helmet Ligety wore at the Sochi Olympics featured robots that looked substantially similar to the copyrighted Red Robots of Mr. Culbert's explodingdog illustrations.

74.     Also as shown, the unauthorized "Robot Boogie" helmet Ligety wore at the Sochi Olympics featured robots that also looked confusingly similar to Mr. Culbert's RED ROBOT trademark.

75.     The image below of an unauthorized "Robot Boogie" helmet is taken from the Shred catalog discussed below, and shows in greater clarity the appearance and detail of the reproductions or derivatives of the robots featured on the unauthorized helmet.



76.     Once Mr. Culbert saw the unauthorized "Robot Boogie" helmet, he immediately thought of his *Sometimes I Forget You're a Robot* book.

77.     This side to side comparison shows  that the robots of the unauthorized "Robot Boogie" helmet are in similar poses as, and look strikingly similar to, the Red Robot drawing on the back of Mr. Culbert's *Sometimes I Forget You're a Robot* book.

 

78.     The image of the unauthorized "Robot Boogie" helmet from the comparison images above is of an unauthorized "Robot Boogie" helmet purchased online from within Connecticut and was delivered to Connecticut.

79.     Consumers will and have been confused by Anomaly's unauthorized use of Red Robots on its unauthorized "Robot Boogie" products.  *See* comparison with the RED ROBOT trademark below:



80.    Having already had his valuable Red Robot character misappropriated without notice or permission, Mr. Culbert decided to contact Shred to gather more information.

81.    Mr. Culbert emailed Shred directly and inquired if Ligety or Shred were fans of his art work, if the robot helmet was intended as a one-off, and to see if Shred had an interest in licensing his Red Robot.

82.    On or around April 3, 2014, Mr. Culbert received a response back directly from Anomaly.  The email exchange between Mr. Culbert and Ms. Troini of Anomaly is attached as **Exhibit S**.

83.    The response from Anomaly was that "the personal helmets used by Mr. Ligety for a single race are exclusively his own choice."

84.    Anomaly then admitted that, "[A]s you may easily realize, Shred did not (and are not intentioned to) carry out any search or investigation about the copyrightable or anyway legal protectable [sic] of such design, nor about any right you may have on it."

85.    Anomaly made clear it was not concerned with any duty or obligation to avoid infringing on Mr. Culbert's rights.

86.    Rather than provide terms for a license, instead Anomaly offered to pay Mr. Culbert up to $3,000 for his waiver of any claim he may have relating to the use of the Red Robot design on <u>Shred helmets</u>.  Shred demanded a response by April 11, purportedly the last day to finalize the <u>Shred helmet</u> collection.

87.    However, upon information and belief, the unauthorized "Robot Boogie" helmet was already planned for mass production, and it was Anomaly's intent all along to have the unauthorized "Robot Boogie" helmet in its collection.  As it is Anomaly's business model to

leverage the exposure the Ligety's skiing provides the Shred products into sales, upon information belief, Ligety wore the unauthorized "Robot Boogie" on the world's largest stage with every intention for Anomaly to sell that helmet.

88.     Mr. Culbert continued his investigation into the unauthorized "Robot Boogie" helmet and before he was able to respond to Anomaly's April 3, 2014 email, he soon discovered that Anomaly was in fact already offering the unauthorized "Robot Boogie" helmet for sale.

89.     Mr. Culbert then engaged intellectual property counsel to represent him and protect his interests in negotiations that already appeared to be entered into by Anomaly in less than good-faith, as Anomaly had withheld that it had already been marketing the "Robot Boogie" helmet. Over the course of the next several months, other material withheld information would come to light as well.

90.     On or around April 25, 2015, Katie Lane, Esq. wrote to Anomaly indicating that despite Mr. Culbert's learning of ongoing preparation to mass market and distribute the unauthorized "Robot Boogie" helmet without his permission, he would still engage in license negotiations to allow Anomaly to compensate him for first, the infringement by Ligety of wearing the unauthorized "Robot Boogie" helmet at the Sochi Olympics and second, allowing otherwise unauthorized helmet sales by Anomaly.  *See* **Exhibit T**, an April 25, 2014 letter from Katie Lane to Ms. Troini.

91.     Ms. Lane made clear that if a license for the unauthorized "Robot Boogie" helmet was not agreed to, that Mr. Culbert would take additional legal action.  At that point, negotiations for Anomaly were taken over by the Italian law firm of Feltrinelli & Brogi.

92.     As the negotiations continued slowly, Ms. Lane further made clear that Mr. Culbert would not permit the continuing unauthorized use of the Red Robot. *See* **Exhibit U**, a June 10, 2014 email from Katie Lane to Andrea Feltrinelli.

93.     Anomaly, through its Italian counsel, never agreed to compensate Mr. Culbert for Ligety's unauthorized use of the Red Robot at the Olympics, arguing instead that "one race at the 2014 Winter Olympics, by Olympic Gold Medalist and worldwide famous ski champion Ted Ligety did not actually damage anyone but that, on the contrary, gave your Client a very interesting promotional opportunity." *See* **Exhibit V**, a July 1, 2014 letter from Andrea Feltrinelli to Katie Lane.

94.     Despite Anomaly's representation that Ligety wore the Robot Boogie helmet at only one race in the Sochi Olympics, Ligety continue to wear the Robot Boogie helmet for the rest the 2013/2014 ski season, including at Kranjska Gora, Slovenia, and at Lenzerheide, Switzerland for the FIS Men's World Cup in March of 2014.

95.     Further, in its July 1 letter, after several months of negotiation on a license that Anomaly lead Mr. Culbert to believe was for the Shred unauthorized "Robot Boogie" helmet, Anomaly first disclosed that "Shred would be interested to continue using the Design on one of one of its ski helmet and goggle styles" (emphasis added).

96.     This attempt by Anomaly to slip in an additional product, a goggle style, into on-going negotiations without even acknowledging that the goggle was already being offered for sale made clear that this infringement matter indeed was of "very small commercial relevance" to Anomaly, and Mr. Culbert's rights were not be taken seriously.

97.     Images of an unauthorized "Robot Boogie" goggle are shown below:





98.     Moreover, it was Anomaly's representation now to Mr. Culbert now that only one helmet style and one goggle style were being considered; however, Anomaly already knew this to be untrue.

99.     In fact, Anomaly's 2014/2015 catalog for Shred Optics and Slytech Protection offered at least 5 different products for sale using the unauthorized "Robot Boogie" design -- the Mega Brain Bucket Robot Boogie Helmet that Ligety wore at the Olympics, plus the Brain Bucket Robot Boogie Helmet, as well as the Monocle Robot Boogie Goggles, the Hoyden Robot Boogie Goggles, and the "spare goggle strap kit" (including an unauthorized "Robot Boogie" strap compatible with the Stupefy, Smartefy, Monocle, Soaza , and Hoyden goggles - which indicates another 3 goggle styles as well).  **Exhibit W**  is selected page of the 2014/2015 Shred Optics and Slytech Protection catalog showing the various unauthorized "Robot Boogie" helmets, goggles, and goggle straps offered for sale.

100.    Upon information and belief, the 2014/2015 catalog for Shred Optics and Slytech Protection was printed and distributed without permission or license from Mr. Culbert to use his Red Robot before Mr. Culbert first contacted Anomaly.

101.    Thereafter, Mr. Culbert purchased an unauthorized "Robot Boogie" helmet and an unauthorized "Robot Boogie" goggle, which were delivered to him in Connecticut.

102.    With the products now available for close inspection, he could examine the details of the artwork of robots reproduced on the Shred products.  As the artist, Mr. Culbert was in the unique position to be able to identify and map each stroke, each line variation, and hand waiver of the lines of the robots reproduced on the unauthorized "Robot Boogie" products to one of his illustrations in particular.  This illustration was titled "depression robot wants to malfunction" and is shown below:



103.    Mr. Culbert's 2-Dimensional artwork titled "depression robot wants to malfunction" from his body of work from explodingdog.com from the year 2012 is protected by U.S. Copyright Registration No. VAu 1-184-402 with a registration date of July 10, 2014. A printout of the Copyright Office records for No. VAu 1-184-402 provided at **Exhibit X**.

104.    Upon information and belief, Defendant used the Red Robot from the "depression robot wants to malfunction" (hereinafter referred to as the "Depression Robot") and digitally manipulated the image to move the arms, hands, legs, head and eyes to position the red and blue robots in the unauthorized "Robot Boogie" design into the positions shown on the products.

105.    Upon information and belief, in the images below, the robots are mirrored, with the left arm of the Depression Robot put on the right side of the Red Robot on the helmet, and the right arm of the Depression Robot put on the left side of the Red Robot on the helmet.



106.    Below is the comparison of another robot from the unauthorized "Robot Boogie" design to the Depression Robot:



107.    Upon information and belief, the left arm of the Depression Robot repositioned on both the left and side sides of the blue derivative of Red Robot on the helmet.

108.    Upon information and belief, this pattern of manipulating the Depression Robot was repeated with each robot on the unauthorized "Robot Boogie" design:



109.    Upon information and belief, of course other extremities may have been repositioned in some robots and the "malfunction" was fixed in each of the fronts of the robots, but the design of each robot on the unauthorized "Robot Boogie" products was taken from Mr. Culbert's Red Robot.

**Defendants' Infringing Conduct Continues Willfully**

110.    It became clear that Anomaly did not respect Mr. Culbert's intellectual property.

111.    The evidence of Anomaly's direct copying of Red Robot demonstrates a reckless disregard for Mr. Culbert copyrighted and trademarked Red Robot.

112.    Upon information and belief, this direct copying is a part of a pattern of copying across other Shred helmet and goggle designs.

113.    On or around December 12, 2014, Michael G. Gabriel, Esq., counsel for Plaintiffs, wrote Anomaly to inform Defendant that "Given your client has been on notice that the Red Robot helmet is unauthorized pursuant to ExplodingDog's copyright and trademark rights and that no agreement has been reached with ExplodingDog, we were surprised to see Mr. Ligety wearing the Red Robot helmet again at the Audi FIS Ski World Cup on December 7, 2014, in Beaver Creek, Colorado." *See* **Exhibit Y**, December 12, 2014, and February 9, 2015, letters from Michael G. Gabriel to Andrea Feltrinelli.

114.    In fact, despite the lack of permission or license, Ligety continued to wear an unauthorized "Robot Boogie" helmet in 2014/2015 ski season, not just at Beaver Creek, Colorado nut also at least at Are, Sweden in the FIS Men's world Cup in December of 2014.

115.    It was clear that Anomaly was not going to cease its on-going infringement nor engage in meaningful and well-intentioned negotiations from Mr. Culbert's perspective focused

on getting an accounting of those unauthorized uses, with the hope of still reaching an amicable resolution. *See* **Exhibit Y**..

116. Despite Mr. Culbert's counsel suggestion that Anomaly engage United States counsel to conduct the negotiations, it did not. Instead, as of March 15, 2015, Anomaly continued to rely on the faulty premise to avoid infringement. Anomaly:

> specifically emphasized that the personal choice of Mr. Ligety to wear the helmet featuring the Red Robot during the 2014 Winter Olympics in Sochi did not certainly cause Adam Culbert any damages (of any kind) but, on the contrary, represented a great showcase for him considering not only that Ted Ligety (two-time Olympic gold medalist) is world-renowned as one of the best ski racers in the world, but also that the Olympics is one of the events with the highest TV viewership globally.

117. Anomaly continues to sell unauthorized "Robot Boogie" helmets and goggles on its website. *See* **Exhibit Z**, printouts from the Anomaly website at <www.shredoptical.com> from October 19, 2015.

**Defendants' Unauthorized and Infringing Conduct is Causing Irreparable Harm**

118. Ligety and Anomaly are promoting, offering for sale and selling merchandise with reproductions and derivatives of Mr. Culbert's Red Robot designs and the RED ROBOT trademark to the same customers as Plaintiff.

119. On information and belief, Ligety has claimed to have designed all the products he uses in competition, including the unauthorized "Robot Boogie" products.

120. Because of Ligety and Anomaly's unauthorized use of the Red Robot, Defendants are expressly and falsely representing to consumers an affiliation between Mr. Culbert and Explodingdog LLC and Defendants, and a sponsorship or endorsement of Defendants by Mr. Culbert and Explodingdog LLC.

30

121.    As a further result of Defendants' unauthorized use of the Mr. Culbert's RED ROBOT trademark, Defendants are falsely advertising and luring consumers to purchase the unauthorized "Robot Boogie" helmets and goggles based on the reputation and goodwill of Mr. Culbert and his RED ROBOT trademark.

122.    Consumers purchasing the unauthorized "Robot Boogie" helmets and goggles from Defendants are likely to be confused as to the source of the products.

123.    Through this scheme of falsely advertising the unauthorized "Robot Boogie" helmets and goggles using Mr. Culbert's RED ROBOT trademark and providing consumers with helmets and goggles not affiliated with Mr. Culbert and Explodingdog LLC, Defendants are intentionally and willfully creating confusion among consumers.

124.    Defendants' emphasis and use of Mr. Culbert's RED ROBOT trademark creates a likelihood of confusion among consumers that their infringing products are associated or connected with Mr. Culbert and Explodingdog LLC.

125.    At no point in time did Defendants ever acquire any rights in Mr. Culbert's Red Robot designs and the RED ROBOT trademark because they had been exclusively associated with and owned by Plaintiffs.

126.    Mr. Culbert has devoted substantial time and expense to cultivating and sustaining his relationships with his crowd-sourced explodingdog website's visitors and fans.  The confusion created by Defendants in regard to Mr. Culbert's RED ROBOT trademark has impaired Mr. Culbert's relationship with those who interact with his website and are consumers of his artwork, despite the loyalty of those fans and consumers to Mr. Culbert and his strong brands and marks.  The confusion created by Defendants in regard to

Mr. Culbert's Red Robot designs and the RED ROBOT trademark has also impaired Mr. Culbert's ability to grow his brand and impairs his ability to seek his own licensing relationships or to expand his market.

127.    Mr. Culbert has relied upon the invaluable goodwill behind Mr. Culbert's RED ROBOT trademark to attract visitors to his website and consumers of his artwork. Defendants' use of Mr. Culbert's RED ROBOT trademark to advertise, market and promote the unauthorized "Robot Boogie" helmet and goggles to consumers is causing confusion among  consumers as to the true source of the goods provided under the mark.

128.    The harm to Mr. Culbert and Explodingdog LLC is incalculable.  As a result of the invaluable goodwill Mr. Culbert has invested and acquired in the Red Robot designs and the RED ROBOT trademark, Defendants' activities are causing and will continue to cause irreparable harm unless enjoined by this Court.

129.    Plaintiffs have no adequate remedy at law.

130.    In addition to his personal liability for choosing and wearing unauthorized "Robot Boogie" helmets in competitions, at all times relevant, Ligety as a corporate officer of Anomaly is also personally liable for Anomaly's trademark infringement and unfair competition.  Ligety did more than merely control corporate affairs of Anomaly, but actually personally took part in Anomaly's tortuous and infringing activities and also specifically directed employees to do so as well.  Ligety was the moving, active conscious force behind Anomaly's action with regard to the RED ROBOT trademark.

131.    Also in addition to his personal liability for choosing and wearing unauthorized "Robot Boogie" helmets in competitions, Ligety is personally liable under a

contributory infringement theory for having knowledge of the copyright infringing activity through his direct participation and/or his activity which induces, causes or materially contributes to the copyright infringing of Anomaly. Ligety is also personally liable under a vicarious liability theory of copyright infringement for Anomaly's infringement because as a corporate officer, (1) Ligety had the right and ability to supervise the infringing conduct, and (2) Ligety had an obvious and direct financial interest in the infringing activity.

132.    Upon information and belief, Defendants have profited and continue to profit from the unauthorized sale of the "Robot Boogie" helmets and goggles.

133.    Upon information and belief, Mr. Culbert and Explodingdog LLC have lost profits or royalties they would have earned from explodingdog Red Robot merchandise but for Defendants' unauthorized copying, distribution, and sale of the merchandise with Red Robot reproductions and derivatives.

## COUNT I – DIRECT COPYRIGHT INFRINGEMENT
### (17 U.S.C. §§ 101 *et seq.*) (*against all Defendants*)

134.    Plaintiffs incorporate by reference the allegations in each of the preceding paragraphs as if fully set forth herein.

135.    The Red Robot – as illustrated the "explodingdog 2000", "explodingdog 2001", "explodingdog 2002", "explodingdog 2003", "*Sometime I Forget You're A Robot*", and "explodingdog 2012" – are original works of authorship and constitute copyrightable subject matter under the laws of the United States.

136.    Plaintiff duly complied with all laws pertinent to the Red Robot, registered the Red Robot with the U.S. Copyright Office (VA 1-633-758, VAu 965-393, VA 1-635-885, VA

1-642-892, TX 7-852-372, and VAu 1-184-402), and is the beneficial owner of the rights in the aforementioned works.

137.    At all times relevant to the Complaint, Plaintiffs are and have been solely and exclusively authorized to, among other things, reproduce and distribute the Red Robot and any merchandise containing the Red Robot Designs, including the products described herein.

138.    Plaintiff has not granted to Defendants any right or license to use the Designs in any manner whatsoever.

139.    Defendants' unauthorized copying, manufacture, reproduction and distribution of helmets and goggles with the Plaintiff's Red Robot constitute infringement of Plaintiff's exclusive rights of reproduction and public display in the copyrights in and to the Red Robot, all in violation of Mr. Culbert's exclusive rights of reproduction and public display under Sections 106(1), 106(5), and 501 of the Copyright Act, 17 U.S.C. §§ 106(1), 106(5) and 501.

140.    Defendant Ligety's unauthorized copying and use of helmets and goggles with the Plaintiffs' Red Robot in skiing competitions and to promote and market his business constitute infringement of Plaintiffs' exclusive rights of reproduction and public display in the copyrights in and to the Red Robot, all in violation of Mr. Culbert's exclusive rights of reproduction and public display under Sections 106(1), 106(5), and 501 of the Copyright Act, 17 U.S.C. §§ 106(1), 106(5) and 501.

141.    Defendants' copying of the Red Robot constitutes the creation of unauthorized derivative works, and the creation thereof violates Mr. Culbert's exclusive right to prepare

34

derivative works under Sections 106(2) and 501 of the Copyright Act, 17 U.S.C. §§ 106(2) and 501.

142.    Upon information and belief, Defendants' infringement of Plaintiffs' copyrights in the Red Robot is deliberate, willful and in utter disregard of Plaintiffs' rights.

143.    Defendants' acts have caused, and will continue to cause, irreparable injury to Plaintiffs.  Plaintiffs have no adequate remedy at law and are thus entitled to an injunction along with damages in an amount to be determined at trial.

144.    As a result of Defendants' acts of infringement alleged herein, Plaintiffs have sustained substantial injury, loss, and damage to his copyright interest in the Red Robot.

145.    Pursuant to Section 504(b) of the Copyright Act, 17 U.S.C. § 504(b), Plaintiffs are entitled to recover from Defendants the damages they have sustained and will sustain, and any profits obtained by Defendants as a result of or attributable to the infringement.  At present, the amount of such damages and profits cannot be fully ascertained by Plaintiffs.

146.    Pursuant to Section 504(c) of the Copyright Act, 17 U.S.C. § 504(c), Plaintiffs are entitled to recover from Defendants statutory damages up to $150,000 per act of infringement.

147.    Pursuant to Section 505 of the Copyright Act, 17 U.S.C. § 505, Plaintiffs are entitled to recover their costs of litigation, including attorney's fees.

## COUNT II – INDIRECT COPYRIGHT INFRINGEMENT
### (17 U.S.C. §§ 101 *et seq.*)(*against Ligety*)

148.    Plaintiffs incorporate by reference the allegations in each of the preceding paragraphs as if fully set forth herein.

149.     Ligety, as an individual, is significantly involved in the sale unauthorized "Robot Boogie" products.  Upon information and belief, Ligety made a decision to ski with the unauthorized "Robot Boogie" helmet in the Olympics and other competitions with the full knowledge and intention that Anomaly would offer for sale and sell unauthorized "Robot Boogie" products.

150.     Ligety, as an officer of Anomaly, directly participated in, and/or induced, caused or materially contributed to Anomaly's infringing acts and sales.

151.     Ligety is not authorized to permit Anomaly or anyone else to distribute, sell, or use the Red Robot Designs in any way.

152.     By the actions alleged above, Ligety has encouraged, assisted, induced, caused and/or materially contributed to a large amount of copyright infringements of the Red Robot Designs.

153.     Moreover, by the actions alleged above, Ligety has derived direct financial benefit from the sale of unauthorized "Robot Boogie" products, and declined to exercise his right and ability to supervise or control the infringing activity, despite his legal right to stop or limit the directly infringing conduct as well as his practical ability to do so.

154.     Ligety's actions, as aforesaid, were done willfully and with deliberate disregard for Mr. Culbert and Explodingdog LLC's rights.

155.     Accordingly, Ligety is indirectly liable for contributory and/or vicarious infringement.

156.     Plaintiffs are entitled to recover from Ligety the damages, including attorney's fees, they have sustained and will sustain, and any gains, profits and advantages obtained by

Ligety, and any such monetary amounts attributable to the aforementioned unauthorized sales by Anomaly, as a result of Ligety's acts of contributory and/or vicarious infringement alleged above, in an amount to be proven at trial.

## COUNT III – FALSE DESIGNATION OF ORIGIN
### Section 43(a)(1)(A) of the Lanham Act (15 U.S.C. § 1125(a)(1)(A))

157. Plaintiffs incorporate by reference the allegations in each of the preceding paragraphs as if fully set forth herein.

158. Defendants have deliberately and willfully attempted to trade on Plaintiffs' hard-earned goodwill in his RED ROBOT mark and the reputation established by Plaintiffs in connection with his good and service in order to confuse customers as to the origin and sponsorship of Defendants' goods and to pass off their goods in commerce as those of Plaintiffs'.

159. Defendants' unauthorized and tortious conduct has also deprived and will continue to deprive Plaintiffs of the ability to control consumer perception of his goods and services offered under the RED ROBOT marks, placing the reputation and goodwill of Plaintiffs and his valuable mark in the hands of Defendants.

160. Defendants' conduct is likely to cause, and has caused, confusion, mistake or deception as to the affiliation, connection or association of Defendants and their goods with Plaintiffs, and as to the origin, sponsorship or approval of Defendants and their good, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. 1125(a)(l).

161. Defendants had direct and full knowledge of Plaintiffs' prior use of and rights in the RED ROBOT mark before the acts complained of herein. The knowing, intentional and

willful nature of the acts set forth herein renders this an exceptional case under 15 U.S.C. § 1117(a).

162.     As a result of Defendants' aforesaid conduct, Plaintiffs have suffered commercial damage, as well as the continuing loss of goodwill and reputation established by Plaintiffs in its RED ROBOT mark.  This continuing loss of goodwill cannot be properly calculated and thus constitutes irreparable harm and injury for which Plaintiffs have no adequate remedy at law.

163.     Plaintiffs will continue to suffer irreparable harm unless this Court enjoins Defendants' conduct.

## COUNT IV – COMMON LAW TRADEMARK INFRINGMENT AND UNFAIR COMPETITION

164.     Plaintiffs incorporate by reference the allegations in each of the preceding paragraphs as if fully set forth herein.

165.     Plaintiffs built up valuable goodwill in  RED ROBOT mark, and the public has come to associate the mark with Plaintiffs.

166.     Defendants have unlawfully used Plaintiffs' RED ROBOT mark, and such use constitutes trademark infringement and unfair competition in violation of the common law of Connecticut.

167.     Defendants' activities are designed with the intent to mislead and/or deceive the trade and public into believing that Defendants' goods are affiliated with, authorized, endorsed, sponsored and/or sanctioned by Plaintiffs or are connected or associated in some way with Plaintiffs, which they are not.  Such acts have caused and continue to cause confusion as to the source and/or sponsorship of Defendants' infringing goods.

168.     Defendants have engaged and continue to engage in this activity knowingly and willfully.

169.     Defendants' acts of common law trademark infringement, unless enjoined by this Court, will continue to cause Plaintiffs to sustain irreparable damage, loss and injury for which Plaintiffs have no adequate remedy at law.

170.     By reason of the acts and conduct of Defendant complained of herein, Plaintiffs have suffered and will continue to suffer irreparable injury including substantial damage to its business in the form of diversion of trade, loss of profits, loss of goodwill and damage to its reputation.

171.     By reason of their acts or unfair competition, Defendants are liable to Plaintiffs for the actual damages incurred by Plaintiffs as a result of Defendants' acts and any additional profits of the Defendants attributable to the infringement, together with costs and attorneys' fees.

## COUNT V – CONNECTICUT UNFAIR TRADE PRACTICES ACT
### Connecticut General Statutes § 42-110a, *et seq*.

172.     Plaintiffs incorporate by reference the allegations in each of the preceding paragraphs as if fully set forth herein.

173.     At all times material hereto, Defendants constitute "persons" within the meaning of Connecticut General Statutes § 42-110a(3).

174.     The conduct of the Defendants, as alleged herein, is illegal, unscrupulous and immoral and is in violation of the public policy of the State of Connecticut.

175.    Defendants' conduct, as aforesaid, was undertaken in wanton, willful or reckless disregard of the law, standards of business morality and public policy, and with intent to injury Plaintiffs.

176.    Defendants' unfair and deceptive conduct caused substantial financial injury to Plaintiffs as a result of wrongfully associating themselves with Plaintiffs for their commercial benefit.

177.    Defendants engaged and continue to engage in trade and commerce within the State of Connecticut, as defined in Connecticut General Statutes § 42-110a(4).

178.    As a direct and proximate cause of Defendants' conduct, Plaintiffs have sustained an ascertainable loss of money.

179.    Defendants' conduct violates the Connecticut Unfair Trade Practices Act ("CUTPA"), Connecticut General Statutes § 42-110a, et seq.

180.    Defendants are liable to Plaintiffs pursuant to Connecticut General Statutes § 42-110a for its losses and other damages recoverable pursuant to CUTPA and are subject to equitable orders enjoining Defendants from continuing to utilize Plaintiffs' name for any purpose.

### COUNT VI – CONNECTICUT UNFAIR SALES PRACTICES ACT
### Connecticut General Statutes § 42-115e, *et seq.*

181.    Plaintiffs incorporate by reference the allegations in each of the preceding paragraphs as if fully set forth herein.

182. By virtue of the Defendant's widespread promotional use of Plaintiffs' Red Robot Designs and the RED ROBOT trademark on goods and in catalogs for those goods constitute deceptive acts.

183. Defendants have made false and misleading representations in commercial advertising that misrepresent the nature, characteristics, and origin of its goods, services and commercial activities in commerce in violation of the Connecticut Unfair Sales Practices Act (Conn. Gen. Stat. §§ 42-115e, *et seq*.).

184. Defendants have made representations, omissions or other practices likely to mislead consumers. As a result, consumers will reasonably be deceived under the circumstances by Defendants' activities. As another result, consumer's decisions or conduct have likely been affected.

185. Defendants are liable to Plaintiffs pursuant to Connecticut General Statutes § 42-115e for its losses and other damages recoverable pursuant to CUSPA and are subject to equitable orders enjoining Defendants from continuing to utilize Plaintiffs' designs and trademark for any purpose.

186. Defendants' deceptive acts were engaged in willfully, and are subject to an order by the Court awarding Plaintiffs' their attorneys' fees and costs.

## COUNT VII – UNJUST ENRICHMENT

187. Plaintiffs incorporate by reference the allegations in each of the preceding paragraphs as if fully set forth herein.

188. As a result of the conduct described above, Defendants have been and will be unjustly enriched at the expense of Plaintiffs. Among other things, Defendants' unfair and illegal actions as described above have enabled Defendants to generate business and sell goods to

customers who, in the absence of Defendants' unfair and illegal actions as described above, would have purchased goods authorized by Plaintiffs.

189.    It would be unjust for Defendants to be permitted to retain the ill-gotten gains wrongfully earned at Plaintiffs' expense.

190.    Plaintiffs are entitled to be compensated for Defendants' unjust enrichment in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully demands:

A.    That the Court find that Defendants directly and/or indirectly infringed Plaintiffs' copyrights in the Red Robot, and engaged in false designation of origin, unfair competition, and unfair trade practices relating thereto;

B.    A permanent injunction providing that, pursuant to 17 U.S.C. § 502 and 15 U.S.C. § 1116(a), Defendants, their owners, partners, officers, directors, agents, servants, employees, representatives, licensees, subsidiaries, manufacturers and distributors, jointly and severally, be enjoined throughout the world during the pendency of this action and permanently thereafter from:

a)    That the Court enter a permanent injunction restraining and enjoining Defendants, their employees, agents, officers, directors, successors, subsidiaries, and assigns, and all those in active concert with them from

i.    imitating, copying, using, reproducing, displaying, and/or preparing derivative works based upon the Red Robot, or otherwise infringing Mr. Culbert's copyrights in any manner, medium, or form;

ii.   manufacturing, reproducing, selling, offering for sale, promoting, advertising, distributing, and/or commercially exploiting in any manner, either directly or indirectly, any product which incorporates the Red Robot; and

iii.   using any false description, representation, or designation, or otherwise engaging in conduct that is likely to create an erroneous impression that Defendants' products are endorsed by Plaintiffs or are connected in any way with Plaintiffs; and

iv.   holding themselves out as licensees or otherwise authorized users of Plaintiffs' Red Robot.

C.    For an order requiring an accounting, and that all gains, profits and advantages derived by Defendants by their direct and/or indirect acts of infringement be deemed held in constructive trust for the benefit of Plaintiffs.

D.    That, pursuant to 17 U.S.C. § 503 and 15 U.S.C. § 1118, Defendants be required to deliver to the Court, or to some other person that the Court may designate, for ultimate destruction, any and all articles of merchandise, including all helmets and goggles and /or other materials in Defendants' possession or control which might, if sold or distributed for sale, violate the injunction granted herein;

E.    For Defendants' direct and/or indirect acts of copyright infringement, that Plaintiffs be entitled to recover all damages suffered by Plaintiffs as a result of Defendants' infringing acts and all profits derived from Defendants' wrongful acts in an amount to be determined at the trial of this action, as provided by 17 U.S.C. § 504(b);

F.     That, pursuant to 15 U.S.C. § 1117, Plaintiffs be awarded such damages available under the Lanham Act, including but not limited to, actual damages, Defendants' profits, treble damages, costs of suit and attorneys' fees;

G.     That Plaintiffs be awarded punitive damages and attorneys' fees pursuant to Connecticut General Statutes § 42-110g(d); and

H.     Such other and further relief as this Court may deem just and proper.


## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.


Date:     October 27, 2015
          Forest Hills, NY                    Respectfully Submitted,


                                              GABRIEL & PELAEZ, PLLC

                                              By:   s/Michael G. Gabriel
                                                     Michael G. Gabriel, Esq.

                                              Michael G. Gabriel (ct22974)
                                              GABRIEL & PELAEZ, PLLC
                                              72-11 Austin St.
                                              PMB No. 406
                                              Forest Hills, NY 11375
                                              p. (917) 515-3970
                                              f. (917) 515-3970
                                              Email: michael@gandplaw.com
                                              ATTORNEY FOR PLAINTIFFS